Nos. 15-15211, 15-15213, 15-15215

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

———————————

PUENTE ARIZONA *et al.*,

*Plaintiffs-Appellees,*

v.

SHERIFF JOSEPH ARPAIO *et al.*,

*Defendants-Appellants.*

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF ARIZONA

———————————

**BRIEF FOR THE UNITED STATES AS AMICUS CURIAE
IN SUPPORT OF NEITHER PARTY**

———————————

BENJAMIN C. MIZER
*Principal Deputy Assistant
Attorney General*

JOHN S. LEONARDO
*United States Attorney*

BETH S. BRINKMANN
*Deputy Assistant Attorney General*

MARK B. STERN
LINDSEY POWELL
JEFFREY E. SANDBERG
WILLIAM E. HAVEMANN
*(202) 616-5372
Attorneys, Appellate Staff
Civil Division, Room 7214
U.S. Department of Justice
950 Pennsylvania Ave., NW
Washington, DC 20530*

**TABLE OF CONTENTS**

**Page**

INTRODUCTION AND SUMMARY ............................................................................ 1

STATEMENT ........................................................................................................ 3

    A.    Federal Immigration Law ............................................................. 3

    B.    Arizona Law ............................................................................... 7

    C.    Prior Proceedings .................................................................... 10

ARGUMENT ...................................................................................................... 11

This Court Should Uphold the Preliminary Injunction to the
Extent the Arizona Laws Rely for Their Enforcement on the
Form I-9 or Penalize Fraud Committed To Demonstrate Work
Authorization Under Federal Immigration Law ..................................... 11

    A.    The Arizona Laws Intrude on Congress's Comprehensive
             Regulation of Immigration-Related Employment Fraud and
             Interfere with the Accomplishment of the Federal Scheme ................... 11

    B.    The Arizona Laws Are Not Preempted in All Applications,
             and this Court Should thus Affirm the Injunction Only in Part ............ 21

CONCLUSION .................................................................................................... 25

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases:**                                                                              **Page(s):**

*Arizona v. United States,*
 132 S. Ct. 2492 (2012) ................. 1, 2, 3, 5, 6, 11, 12, 13, 15, 16, 17, 19, 20, 21, 22, 23

*Buckman Co. v. Plaintiffs' Legal Comm.,*
 531 U.S. 341 (2001) ............................................................................... 18

*Chamber of Commerce of the U.S. v. Whiting,*
 131 S. Ct. 1968 (2011) ........................................................................ 3, 5, 12

*Citizens United v. FEC,*
 558 U.S. 310 (2010) ............................................................................... 25

*Crosby v. National Foreign Trade Council,*
 530 U.S. 363 (2000) ............................................................................... 17

*DeCanas v. Bica,*
 424 U.S. 351 (1976) ............................................................................. 3, 12

*E. & J. Gallo Winery v. Gallo Cattle Co.,*
 967 F.2d 1280 (9th Cir. 1992) ................................................................. 24

*Exxon Corp. v. Hunt,*
 475 U.S. 355 (1986) ............................................................................... 22

*Galper v. JP Morgan Chase Bank, N.A.,*
 802 F.3d 437 (2d Cir. 2015) ................................................................... 23

*Georgia Latino All. for Human Rights v. Governor of Ga.,*
 691 F.3d 1250 (11th Cir. 2012) ............................................................... 18

*Hines v. Davidowitz,*
 312 U.S. 52 (1941) ............................................................................. 12, 21

*Ibarra-Hernandez v. Holder,*
 770 F.3d 1280 (9th Cir. 2014) ................................................................. 21

*John Doe No. 1 v. Reed,*
   561 U.S. 186 (2010)..................................................................24, 25

*Lozano v. City of Hazleton,*
   724 F.3d 297 (3d Cir. 2013) ........................................................ 21

*Melendres v. Arpaio,*
   784 F.3d 1254 (9th Cir. 2015)...................................................... 24

*National Fed'n of Blind v. United Airlines Inc.,*
   813 F.3d 718 (9th Cir. 2016).................................................17, 18

*New Hampshire v. Maine,*
   532 U.S. 742 (2001) .................................................................... 21

*Rice v. Santa Fe Elevator Corp.,*
   331 U.S. 218 (1947) .................................................................... 13

*United States v. Alabama,*
   691 F.3d 1269 (11th Cir. 2012).................................................21, 23

*United States v. National Treasury Emps. Union,*
   513 U.S. 454 (1995) .................................................................... 24

*United States v. South Carolina,*
   720 F.3d 518 (4th Cir. 2013)...........................................11, 18, 23

*Valle Del Sol v. Whiting,*
   732 F.3d 1006 (9th Cir. 2013)..........................................2, 17, 20

*Villas at Parkside Partners v. City of Farmers Branch,*
   726 F.3d 524 (5th Cir. 2013) ...................................................... 21

**Statutes:**

Immigration and Nationality Act, 8 U.S.C. §§ 1101 *et seq.* ................................. 3

   8 U.S.C. § 1182(a)(6)(C).................................................................... 1

8 U.S.C. § 1182(a)(6)(C)(i)-(ii) ........................................................... 7, 16

8 U.S.C. § 1182(a)(6)(F) ..................................................................... 7, 16

8 U.S.C. § 1227 ..................................................................................... 10

8 U.S.C. § 1227(a)(3)(B)(ii) ..................................................................... 1

8 U.S.C. § 1227(a)(3)(B)(iii) ............................................................. 7, 16

8 U.S.C. § 1227(a)(3)(C)(i) .............................................................. 1, 7, 16

8 U.S.C. § 1227(a)(3)(C)(ii) ....................................................................... 7

8 U.S.C. § 1227(a)(3)(D) ................................................................. 1, 7, 16

8 U.S.C. § 1255(c)(2) ......................................................................... 7, 16

8 U.S.C. § 1255(c)(8) ................................................................................ 7

8 U.S.C. § 1324a(a)(1) ...................................................................... 3, 16

8 U.S.C. § 1324a(a)(1)(A) .................................................................... 1, 4

8 U.S.C. § 1324a(a)(1)(B) ......................................................................... 4

8 U.S.C. § 1324a(a)(2) ......................................................................... 4, 16

8 U.S.C. § 1324a(b) ....................................................................... 1, 4, 16

8 U.S.C. § 1324a(b)(1)(A)-(D) ................................................................. 4

8 U.S.C. § 1324a(b)(2) ............................................................................... 4

8 U.S.C. § 1324a(b)(5) ..................................................... 5, 10, 13, 14

8 U.S.C. § 1324a(e) ............................................................................ 5, 16

8 U.S.C. § 1324a(e)(4)-(5) ....................................................................... 5

8 U.S.C. § 1324a(f) ............................................................................ 5, 16

8 U.S.C. § 1324a(h) ................................................................................. 4

8 U.S.C. § 1324a(h)(3) ........................................................ 1, 4, 7, 8, 15

8 U.S.C. § 1324a note .............................................................................. 5

8 U.S.C. § 1324c ................................................................................. 7, 10

8 U.S.C. § 1324c(a) ............................................................................... 16

8 U.S.C. § 1324c(a)(1)-(4) ...................................................................... 6

8 U.S.C. § 1324c(d)(3) .......................................................................... 16

6 U.S.C. § 202(3) .................................................................................... 4

6 U.S.C. § 271(b) .................................................................................... 4

6 U.S.C. § 557 ........................................................................................ 4

18 U.S.C. § 1028 ................................................................................... 23

18 U.S.C. § 1546 ..................................................................................... 7

18 U.S.C. § 1546(a) ........................................................... 1, 6, , 10, 16

18 U.S.C. § 1546(b) ............................................................. 1, 6, 10, 16

18 U.S.C. § 1581 ................................................................................... 18

18 U.S.C. § 1584 ................................................................................... 18

18 U.S.C. § 1589 ................................................................................... 18

18 U.S.C. § 1590 ................................................................................... 18

22 U.S.C. § 7101(b)(19) ....................................................................... 20

Ariz. Rev. Stat. § 13-702 ................................................................. 11

Ariz. Rev. Stat. § 13-703 ................................................................. 11

Ariz. Rev. Stat.§ 13-2008 ............................................................. 8, 11

Ariz. Rev. Stat. § 13-2008(A) ...................................................... 8, 9, 22

Ariz. Rev. Stat. § 13-2009 ............................................................ 7, 11

Ariz. Rev. Stat. § 13-2009(A)(3) ............................................... 7, 8, 9, 22

Ariz. Rev. Stat. § 23-211(11) ............................................................ 7

## Regulations:

8 C.F.R. § 274a.1(f) ....................................................................... 4

8 C.F.R. § 274a.2(b)(1)(i)-(ii) .......................................................... 4

8 C.F.R. § 274a.2(b)(1)(v)(A) ......................................................... 4

8 C.F.R. § 274a.2(b)(1)(v)(C) ......................................................... 4

8 C.F.R. § 274a.2(b)(1)(viii) ........................................................... 5

8 C.F.R. § 274a.10........................................................................ 5

8 C.F.R. § 274a.12(a)-(c) .......................................................... 4, 15

## Legislative Materials:

Arizona House Bills:

H.B. 2745 .................................................................................. 8

H.B. 2779 ........................................................................... 7, 8, 9

H.R. Rep. No. 682 (II), 99th Cong., 2d Sess. (1986), *reprinted in*
   1986 U.S.C.C.A.N. 5649 ................................................................................... 19


**Other Authorities:**

Declaration of Daniel Ragsdale, Exec. Assoc. Dir., U.S. Immigration
   and Customs Enforcement, *United States v. Arizona*, No. 10-cv-1413
   (D. Ariz. July 7, 2010) (docket entry 27-4) ................................................... 19

Order Amending Judgment, *United States v. Maricopa County*,
   No. CV-12-981 (D. Ariz. Nov. 6, 2015) (docket entry 417) ........................................ 9

U.S. Dep't of Labor, *Interagency Working Group for the Consistent Enforcement of
   Federal Labor, Employment and Immigration Laws* (Dec. 2015), www.dol.gov/
   dol/fact-sheet/immigration/ IWGDecember2015ProgressReport.htm ........... 19, 20

## INTRODUCTION AND SUMMARY

The United States submits this brief in response to the Court's order inviting the government's views on "whether the Arizona employment-related identity theft provisions challenged in this appeal . . . are preempted by federal immigration law." For the reasons that follow, the Court should hold those provisions preempted to the extent they rely for their enforcement on information in or accompanying the federal Form I-9, or penalize fraud committed to demonstrate authorization to work in the United States under federal immigration law.

Federal law makes it unlawful to employ an "unauthorized alien"—*i.e.*, one who is not lawfully admitted for permanent residence or otherwise authorized to be employed in the United States. 8 U.S.C. § 1324a(a)(1)(A), (h)(3). And it provides "a comprehensive framework for 'combating the employment of'" such persons. *Arizona v. United States*, 132 S. Ct. 2492, 2504 (2012). The federal scheme makes employers primarily responsible for preventing unauthorized aliens from obtaining employment, including by requiring employers to take steps to verify employees' work authorization through a federal employment verification system, 8 U.S.C. § 1324a(b).

Congress has provided a detailed scheme of criminal, civil, and immigration-related consequences for aliens who commit fraud to induce an employer to believe that they are authorized to work in the United States under federal immigration law. *See* 8 U.S.C. §§ 1182(a)(6)(C), 1227(a)(3)(B)(ii), (C)(i), (D), 1324c; 18 U.S.C. § 1546(a)-(b). Federal officials exercise substantial discretion in choosing among these

enforcement options, and their enforcement decisions take into account a variety of federal policy objectives, including the needs of federal law enforcement.

State laws that criminalize fraud in the federal employment verification system, or fraud otherwise committed to demonstrate work authorization under federal immigration law, interfere with these federal prerogatives and intrude upon matters that Congress has brought within its "exclusive governance." *Arizona*, 132 S. Ct. at 2501. As with many other efforts by the State of Arizona to regulate the presence, movement, and employment of aliens, "[p]ermitting the State to impose its own penalties" for fraud committed by aliens to demonstrate work authorization under federal immigration law "would conflict with the careful framework Congress adopted," *id.* at 2502, and impermissibly "divest[] federal authorities of the exclusive power to prosecute these crimes," *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1027 (9th Cir. 2013). Accordingly, the Arizona laws are preempted to the extent they attempt to regulate such fraud.

It does not follow, however, that the challenged provisions are preempted in their entirety. To the extent the laws also regulate instances of identity theft that do not implicate federal immigration prerogatives, the laws are not preempted in those applications. Accordingly, the Court should uphold the preliminary injunction only to the extent investigations and prosecutions under the challenged provisions rely on information provided in the Form I-9 and accompanying documents, or regulate fraud committed to demonstrate work authorization under federal immigration law.

2

## STATEMENT

### A. Federal Immigration Law

**1.** "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012). Pursuant to that power, Congress enacted the Immigration and Nationality Act (INA), 8 U.S.C. §§ 1101 *et seq.*, and other immigration laws that "establish[] a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1973 (2011) (internal quotation marks omitted).

Initially, this regime did not provide for comprehensive federal regulation of alien employment. *Whiting*, 131 S. Ct. at 1974; *DeCanas v. Bica*, 424 U.S. 351, 360 (1976). But with the enactment of the Immigration Reform and Control Act (IRCA) in 1986, Congress brought the regulation of employment of aliens within the comprehensive federal regulation of immigration under the INA. *See Arizona*, 132 S. Ct. at 2504.

IRCA amended the INA to make it unlawful to knowingly employ an "unauthorized alien," *see* 8 U.S.C. § 1324a(a)(1), and established "a comprehensive framework" for regulating the employment of such persons. *Arizona*, 132 S. Ct. at 2504. Within this framework, the term "unauthorized alien" refers to a person who is not "either (A) an alien lawfully admitted for permanent residence, or (B) authorized

to be so employed by this chapter or by the [Secretary of Homeland Security]."
8 U.S.C. § 1324a(h)(3); *see* 8 C.F.R. § 274a.12(a)-(c).[1]

Congress made employers primarily responsible for preventing unauthorized aliens from obtaining employment by making it illegal for employers to hire or employ a person the employer knows to be an unauthorized alien, 8 U.S.C. § 1324a(a)(1)(A), (a)(2), and by requiring employers to verify the work authorization of the people they hire, *id.* § 1324a(a)(1)(B), (b); 8 C.F.R. § 274a.2(b)(1)(i)-(ii). The employer must attest under penalty of perjury that it has verified that an employee "is not an unauthorized alien" by physically examining specified documents—such as a U.S. passport, permanent resident card, driver's license and unrestricted social security card, or comparable documentation—evidencing the employee's identity and work authorization under federal immigration law, and confirming that those documents reasonably appear to be genuine. 8 U.S.C. § 1324a(b)(1)(A)-(D); 8 C.F.R. § 274a.2(b)(1)(v)(A), (C). On the same form—known as the Form I-9—employees must also make an attestation of their work-authorized status. 8 U.S.C. § 1324a(b)(2).[2]

---

[1] In 2002, responsibility for administering 8 U.S.C. § 1324a(h) was transferred from the Attorney General to the Secretary of Homeland Security. *See* 6 U.S.C. §§ 202(3), 271(b), 557.

[2] Employers need not complete and retain a Form I-9 for independent contractors, persons hired before November 6, 1986, those performing "casual domestic services" in certain situations, and employees considered to be continuing in their employment. 8 C.F.R. §§ 274a.1(f), 274a.2(b)(1)(viii).

In addition, employers may (and under Arizona law, must) verify an employee's work eligibility through E-Verify, the federal government's electronic employment-authorization verification system. *Whiting*, 131 S. Ct. at 1975; 8 U.S.C. § 1324a note.

IRCA provides that the Form I-9, "and any information contained in or appended to such form, may not be used for purposes other than for enforcement of" the INA and enumerated federal laws regarding false statements, identification-document fraud, fraud in the federal employment verification system, and perjury. 8 U.S.C. § 1324a(b)(5). Thus, "Congress has made clear . . . that any information employees submit to indicate their work status 'may not be used' for purposes other than prosecution under specified federal criminal statutes," or for civil enforcement of federal immigration law. *Arizona*, 132 S. Ct. at 2504.

**2.** Federal employment-authorization verification requirements are enforced against employers "through criminal penalties and an escalating series of civil penalties tied to the number of times an employer has violated the provisions." *Arizona*, 132 S. Ct. at 2504; 8 U.S.C. § 1324a(e)-(f). Civil penalties include fines ranging from $275 to $16,000 for each unauthorized alien hired in violation of § 1324a(a), and from $100 to $1,100 for each violation of the verification system's paperwork requirements. 8 U.S.C. § 1324a(e)(4)-(5); 8 C.F.R. § 274a.10. Congress also established an administrative enforcement framework for administering these civil penalties, subject to judicial review. 8 U.S.C. § 1324a(e).

Federal law does not impose criminal sanctions on unauthorized aliens for seeking or engaging in employment. *See Arizona*, 132 S. Ct. at 2504 ("Congress made a deliberate choice not to impose criminal penalties" for such conduct). But through IRCA and subsequent enactments, Congress did establish a comprehensive regime of criminal, civil, and immigration-related consequences for aliens who commit fraud to demonstrate their authorization to work in the United States.

Congress authorized specific criminal penalties for aliens who commit employment-authorization-related fraud. A person may not knowingly use a document not lawfully issued to the person, a false document, or a false attestation "for the purpose of satisfying a requirement" of the federal employment verification system. 18 U.S.C. § 1546(b). A violator of that criminal prohibition may be fined and sentenced to up to five years in prison. *Id.* Federal law further provides potentially more serious criminal penalties for a person who uses or possesses an immigration document, including one that demonstrates federal work authorization, "knowing it to be forged, counterfeited, altered, or falsely made, or to have been procured by . . . fraud or unlawfully obtained." *Id.* § 1546(a).

In addition, Congress created civil penalties for document fraud in conjunction with federal immigration requirements, including the work authorization requirement. 8 U.S.C. § 1324c(a)(1)-(4). And it imposed adverse immigration consequences for aliens who commit fraud to establish work authorization under federal immigration law. Congress made removable aliens convicted under the criminal document fraud

provisions in 18 U.S.C. § 1546, *see* 8 U.S.C. § 1227(a)(3)(B)(iii); aliens who violate the civil penalty provision in 8 U.S.C. § 1324c, *see id.* § 1227(a)(3)(C)(i);[3] and aliens who falsely represent that they are U.S. citizens for immigration purposes, including for the purpose of establishing federal work authorization, *see id.* § 1227(a)(3)(D). Congress further provided that aliens who engage in such fraud are rendered inadmissible. *See id.* § 1182(a)(6)(C)(i)-(ii), (F). In addition, federal law in many cases precludes an alien who was lawfully admitted as a nonimmigrant from adjusting his status to lawful permanent residence if the alien was employed while he was an "unauthorized alien." *Id.* § 1255(c)(2), (8).

### B. Arizona Law

This litigation implicates portions of two Arizona criminal laws. H.B. 2779, entitled the "Legal Arizona Workers' Act," enacted a variety of measures intended to curb the employment of "unauthorized aliens" in Arizona. *See* ER 3248-57. The law defined "unauthorized alien" as "an alien who does not have the legal right or authorization under federal law to work in the United States as described in 8 [U.S.C.] § 1324a(h)(3)." Ariz. Rev. Stat. § 23-211(11); *see* ER 3250. Among the measures enacted by H.B. 2779 was an amendment to Arizona's aggravated identity theft statute, Ariz. Rev. Stat. § 13-2009, making it a crime to knowingly use the identifying

---

[3] The Attorney General may waive this consequence in certain circumstances. *See* 8 U.S.C. § 1227(a)(3)(C)(ii).

information of another person, whether real or fictitious, "with the intent to obtain employment." *Id.* § 13-2009(A)(3); *see* ER 3249. The employer delicensing provision at issue in *Whiting* was also among the measures enacted in that bill.

Similarly, H.B. 2745, captioned "An Act . . . Relating to Employment of Unauthorized Aliens," amended Arizona's identity theft statute, Ariz. Rev. Stat. § 13-2008, to criminalize the use of identifying information of another person, whether real or fictitious, "with the intent to obtain or continue employment." Ariz. Rev. Stat. § 13-2008(A); *see* ER 3269-70. That amendment was enacted contemporaneously with a number of measures expressly addressing the employment of unauthorized aliens. *See* ER 3269-86. Prior to these amendments, Arizona law did not specifically make it a crime to commit identity theft for purposes of obtaining or continuing employment.

There is substantial evidence indicating that the Arizona laws "are aimed at imposing criminal penalties on unauthorized aliens who seek or engage in unauthorized employment." ER 26. The bills' titles reflect that purpose, and the legislative history demonstrates the legislature's hope and expectation that the new criminal penalties would facilitate the removal of unauthorized aliens from the State. ER 27; *see, e.g.*, SER 190 (Sen. O'Halleran) (predicting that aliens arrested for using "false ID" to obtain a job would "self-deport as part of a plea agreement" and "go back to their country of origin"); SER 187 (Sen. Burns) (opposing proposal to reduce the severity of penalties available under Ariz. Rev. Stat. § 13-2009(A)(3), lest such action be "viewed as a weakening" of "our opposition to illegal immigration"); SER

149-52 (Rep. Pearce) (noting overall goal of H.B. 2779 to cause "attrition" of "illegal alien[s]" from the United States).

In Maricopa County—the largest county in Arizona—the challenged laws have indisputably been used primarily to prosecute unauthorized aliens. *See* ER 16; SER 196 (in 55 worksite raids, "100% of all suspects found to be committing identity theft to gain employment were illegal aliens"); SER 196-97 (announcing intent to "continue to enforce the illegal immigration laws" through "employer sanctions/identity theft operations"); SER 222 (identifying Ariz. Rev. Stat. §§ 13-2008(A) and 13-2009(A)(3) as "Illegal Immigration Legislation"). Indeed, the challenged laws were so often used to support raids on businesses thought to be employing unauthorized aliens that the United States brought suit against Maricopa County and its Sheriff for a pattern or practice of discriminatory enforcement against, and unlawful detention of, Latinos. *See United States v. Maricopa County*, No. CV-12-981 (D. Ariz. 2012).[4]

Notwithstanding this focus on unauthorized aliens, the record indicates that the challenged Arizona laws have been applied on at least some occasions to individuals who, in seeking employment, commit fraud to conceal information other than a lack

---

[4] Following the entry of the preliminary injunction in this case, Maricopa County and its Sheriff settled the lawsuit with a consent decree that places conditions upon their ability to resume enforcement of the challenged provisions in the event that the preliminary injunction is lifted. *See* Order Amending Judgment, *United States v. Maricopa County*, No. CV-12-981 (D. Ariz. Nov. 6, 2015) (docket entry 417). That agreement does not bind officials outside Maricopa County.

of work authorization under federal immigration law. *See* State Br. 9 & n.2. For example, the Maricopa County Attorney's Office pursued prosecution of one U.S. citizen who, seeking employment in the health care field, used a false identity in order to hide her felony drug conviction. ER 339-40, 594-95, 661, 664.

### C. Prior Proceedings

Plaintiffs moved to preliminarily enjoin the challenged provisions of state law, urging that they are preempted on their face by federal immigration law. The district court agreed. Concluding that the state provisions plainly are "aimed at imposing criminal penalties on unauthorized aliens who seek or engage in unauthorized employment in the State of Arizona," ER 27, the court held that plaintiffs could likely show that the laws are preempted by federal immigration law under both field and conflict preemption theories.

In its field preemption analysis, the court concluded that "unauthorized-alien fraud in seeking employment" has "been heavily and comprehensively regulated by Congress." ER 28. The court observed that federal law provides civil, criminal, and immigration consequences for persons who use false documents to demonstrate work authorization in the United States, 8 U.S.C. §§ 1227, 1324c; 18 U.S.C. § 1546(a)-(b), and that Congress has expressly restricted the use of information submitted through the federal employment verification system, 8 U.S.C. § 1324a(b)(5). The court concluded that "[t]hese provisions evince an intent to occupy the field of regulating fraud against the federal employment verification system," and that the Arizona laws

10

are preempted because they "have the purpose and effect of regulating the same field." ER 29-30 (citing *United States v. South Carolina*, 720 F.3d 518 (4th Cir. 2013)).

With respect to conflict preemption, the court explained that although the challenged Arizona laws "pursue essentially the same purpose as the federal statutes described above," they "adopt different sanctions." ER 30-31. Whereas the federal scheme allows federal officials to select among a range of criminal, civil, and immigration sanctions, enforcement of the Arizona laws is authorized only through criminal prosecution, and the authorized penalty under state law is up to 8.75 years' imprisonment for first-time offenders, Ariz. Rev. Stat. §§ 13-702, 13-703, 13-2008, 13-2009—a period longer than the 5 years authorized by 18 U.S.C. § 1546(b). ER 31. The court concluded that these different, overlapping state criminal sanctions present an obstacle to the intended operation of the detailed federal scheme. ER 31-32.

## ARGUMENT

**This Court Should Uphold the Preliminary Injunction to the Extent the Arizona Laws Rely for Their Enforcement on the Form I-9 or Penalize Fraud Committed To Demonstrate Work Authorization Under Federal Immigration Law.**

**A.** **The Arizona Laws Intrude on Congress's Comprehensive Regulation of Immigration-Related Employment Fraud and Interfere with the Accomplishment of the Federal Scheme.**

**1.** "The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens." *Arizona v. United States*, 132 S. Ct. 2492, 2498 (2012). The "power to restrict, limit, [and] regulate . . . aliens as a distinct

group is not an equal and continuously existing concurrent power of state and nation[;] . . . whatever power a state may have is subordinate to supreme national law." *Hines v. Davidowitz*, 312 U.S. 52, 68 (1941). The federal government has ultimate authority to regulate the treatment of aliens in the United States because it is the Nation as a whole, and not any single State, that must respond to the international consequences of such treatment. *See Arizona*, 132 S. Ct. at 2498.

Cognizant of these significant national interests, Congress "established a comprehensive federal statutory scheme for regulation of immigration and naturalization and set the terms and conditions of admission to the country and the subsequent treatment of aliens lawfully in the country." *Chamber of Commerce of U.S. v. Whiting*, 131 S. Ct. 1968, 1973 (2011) (internal quotation marks omitted). Although "local regulation[s]" do not exceed state authority where the regulations have only a "purely speculative and indirect impact on immigration," *DeCanas v. Bica*, 424 U.S. 351, 355 (1976), even a regulation in an area of traditional state authority is preempted by federal immigration law if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Arizona*, 132 S. Ct. at 2501 (quoting *Hines*, 312 U.S. at 67). In addition, state laws are preempted where they seek to regulate in a field where federal regulation is "so pervasive . . . that Congress left no room for the States to supplement it," or where there exists a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state

laws on the same subject." *Id.* (alterations in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

**2.** There is no dispute in this case that federal law preempts state regulation of fraud committed on the Form I-9 and accompanying documents. IRCA provides that the Form I-9, "and any information contained in or appended to such form, may not be used for purposes other than for enforcement of [the INA]" and certain other enumerated federal laws regarding false statements, identification-document fraud, immigration fraud (including fraud in the federal employment verification system), and perjury. 8 U.S.C. § 1324a(b)(5). Thus, "Congress has made clear . . . that any information employees submit to indicate their work status 'may not be used'" other than for purposes of those "specified" federal statutes. *Arizona*, 132 S. Ct. at 2504.

Defendants concede that § 1324a(b)(5) "leaves no question that Congress did not intend for States to use [the] Form I-9 for prosecuting their own crimes." State Br. 38. Arizona's identity theft provisions are thus indisputably preempted to the extent that enforcement of those provisions would rely on information taken from or accompanying the Form I-9. The prohibition on state or local use of that information applies regardless of the purpose for which the information was provided. For example, if a U.S. citizen provided a false name or social security number on the Form I-9 in order to conceal a criminal record from a prospective employer, § 1324a(b)(5) would preclude a State from using the Form I-9 to prosecute that person.

Defendants profess not to rely on the Form I-9 in enforcing the challenged laws, but the record suggests otherwise. The prosecutions cited by defendants show that local officials routinely seize such records and apparently rely on them during criminal investigations. *See, e.g.,* ER 386, 753, 851-52, 1150-51, 1294-95, 1724-25, 1738-46, 2109-10, 2716-20. Such state or local investigative reliance on information provided in or accompanying the Form I-9 is as much at odds with the prohibition in § 1324a(b)(5) as the eventual introduction of such information as evidence in court. In stating that information within or accompanying the Form I-9 "may not be used" other than for enumerated federal purposes, § 1324a(b)(5) does not distinguish between reliance on such information for investigation or prosecution. In practical terms, § 1324a(b)(5) therefore constrains state and local law enforcement's ability to rely on the Form I-9 as an investigative lead, or as the basis for obtaining a warrant to raid a workplace thought to be employing unauthorized aliens.

Section 1324a(b)(5), considered on its own, would not preclude a State from relying on the same information taken from another source—*e.g.*, from "employment applications, state payroll tax forms, credit release forms, direct deposit forms and other documents not covered by the federal Form I-9 process." State Br. 9-10. Contrary to defendants' contention, however, Congress's prohibition on the use of information provided in connection with the Form I-9 does not express the outer limits of preemption by federal law in this area. The prohibition in § 1324a(b)(5) speaks only to restrictions on the use of certain information. It does not speak to

14

whether federal immigration law, with its detailed set of penalties and other consequences for fraud committed to demonstrate work authorization under federal immigration law, precludes States and localities from creating their own separate regimes for punishing the very same fraud.  Indeed, it is well established that "the existence of an express pre-emption provision does *not* bar the ordinary working of conflict pre-emption principles or impose a special burden that would make it more difficult to establish the preemption of laws falling outside the clause." *Arizona*, 132 S. Ct. at 2504-05 (alteration and internal quotation marks omitted).

**3.**  The challenged provisions are further preempted to the extent they regulate fraud committed to demonstrate authorization to work in the United States under federal immigration law.  The circumstances in which an employee may commit such fraud are not limited to the attestation in the Form I-9 and supporting documents, and Congress has comprehensively regulated such fraud even when it is committed outside the Form I-9 process.  Accordingly, state regulation is further preempted insofar as it intrudes on or stands as an obstacle to this federal regulatory scheme.

IRCA brought regulation of alien employment within the broader comprehensive federal framework of immigration regulation.  Federal law establishes which aliens can be authorized to work in the United States, 8 U.S.C. § 1324a(h)(3); *see* 8 C.F.R. § 274a.12(a)-(c), and it imposes numerous requirements on employers to ensure that their employees are not "unauthorized aliens" prohibited from obtaining employment in the United States.  Congress made employers primarily responsible for

preventing unauthorized aliens from obtaining employment by establishing an employment-authorization verification system, and by imposing sanctions on employers that knowingly hire or employ unauthorized aliens. 8 U.S.C. § 1324a(a)(1)-(2), (e), (f); *Arizona*, 132 S. Ct. at 2504.

Federal law also provides a comprehensive regime of criminal, civil, and immigration-related consequences for individuals who commit fraud to demonstrate work authorization under federal immigration law. A person who uses a false identification document or makes a false attestation "for the purpose of satisfying a requirement of" the federal employment verification system set forth in 8 U.S.C. § 1324a(b) may be fined, or sentenced to up to five years in prison, or both. 18 U.S.C. § 1546(b). And a person who commits fraud to demonstrate his work authorization under federal immigration law—whether or not that fraud is committed specifically within the Form I-9 process—may be imprisoned for up to ten years, in most cases. *See id.* § 1546(a) (prohibiting a broad range of immigration-document fraud, including with respect to documents that evidence authorized employment in the United States). In addition, Congress specified that persons who commit immigration-document fraud are subject to civil penalties, 8 U.S.C. § 1324c(a), (d)(3), and that unauthorized aliens who engage in fraud to establish work authorization under federal immigration law are subject to adverse immigration consequences, *id.* §§ 1182(a)(6)(C)(i)-(ii), (F), 1227(a)(3)(B)(iii), (3)(C)(i), (3)(D), 1255(c)(2).

The challenged state criminal laws differ substantially from this comprehensive federal scheme. Whereas federal law provides "a full set of standards designed to work as a harmonious whole," including options for imposition of criminal, civil, or immigration consequences, *Valle del Sol, Inc. v. Whiting*, 732 F.3d 1006, 1025 (9th Cir. 2013) (internal quotation marks omitted), the Arizona laws are enforceable only through criminal prosecution. *See Arizona*, 132 S. Ct. at 2505 (recognizing that a "conflict in technique can be fully as disruptive to the system Congress enacted as conflict in overt policy") (alteration and internal quotation marks omitted). Indeed, in many circumstances, the challenged Arizona laws would authorize a harsher criminal sentence than would be available under federal law. Arizona's laws thereby threaten to disrupt "Congress's intentional calibration of the appropriate breadth of the law and severity of the punishment" for fraud committed by aliens to demonstrate work authorization under federal immigration law. *Valle del Sol*, 732 F.3d at 1025; *see also, e.g.*, *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 380 (2000) (holding preempted a state law implicating foreign relations where the "inconsistency of sanctions . . . undermine[d] the congressional calibration of force").

Even if the state penalties were more consistent with federal law, the State's usurpation of federal enforcement discretion in this context would intrude on and interfere with the scheme enacted by Congress. A state law is preempted where federal regulation is so pervasive "as to make reasonable the inference that Congress left no room for the States to supplement it." *National Fed'n of Blind v. United Airlines*

*Inc.*, 813 F.3d 718, 733 (9th Cir. 2016) (internal quotation marks omitted). Because Congress has comprehensively regulated fraud committed by unauthorized aliens to demonstrate their work authorization under federal law, "even complementary or auxiliary state laws are not permitted." *United States v. South Carolina*, 720 F.3d 518, 533 (4th Cir. 2013). It is the prerogative of *federal* officials to police fraud by aliens committed to demonstrate work authorization under *federal* immigration laws. *See id.* (holding that Congress has occupied the field of "creating, possessing, and using fraudulent immigration documents"); *Georgia Latino All. for Human Rights v. Governor of Ga.*, 691 F.3d 1250, 1267 (11th Cir. 2012) (holding preempted a Georgia law that "layer[ed] additional penalties atop federal [immigration] law"); *cf. Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347-48 (2001) (holding preempted a State's effort to police fraud on federal agencies under federal regulatory scheme).

Moreover, a critical feature of the comprehensive federal scheme is the discretion that it affords federal officials. In deciding whether and how to address an unauthorized alien who has committed fraud to demonstrate he or she is authorized to work in the United States, those officials balance a range of competing interests.

For example, the Department of Homeland Security has prioritized the investigation and prosecution of employers who knowingly hire unauthorized aliens. Federal law enforcement officials routinely rely on foreign nationals, including unauthorized aliens, to build criminal cases, particularly cases against human traffickers, *see, e.g.*, 18 U.S.C. §§ 1581, 1584, 1589, 1590, and employers who violate

18

IRCA. *See* ER 248, 258-59. The ability to rely on unauthorized aliens as witnesses in high-priority criminal proceedings advances important federal interests that would be thwarted by parallel state prosecutions of the same individuals for offenses already regulated by federal law. *See* Decl. of Daniel Ragsdale, Exec. Assoc. Dir., U.S. Immigration and Customs Enforcement ¶¶ 21, 33-38, *United States v. Arizona*, No. 10-cv-1413 (D. Ariz. July 7, 2010) (docket entry 27-4). The discretion of federal officials to choose among criminal, civil, and immigration consequences for the employee may be important in securing such testimony.

Federal officials also exercise their discretion to accommodate a variety of policy interests. For example, in enacting laws prohibiting the employment of unauthorized aliens, Congress also pointed to the need to protect against unfair labor practices, including those committed against unauthorized aliens, who "face the possibility of employer exploitation because of their removable status." *Arizona*, 132 S. Ct. at 2504. The prevention of such practices is consistent with Congress's intent to "limit the hiring of undocumented employees and the depressing effect on working conditions caused by their employment." H.R. Rep. No. 682 (II), 99th Cong., 2d Sess. 8-9 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5649, 5757-58; *see also* U.S. Dep't of Labor, *Interagency Working Group for the Consistent Enforcement of Federal Labor, Employment and Immigration Laws* (Dec. 2015), www.dol.gov/dol/fact-sheet/immigration/IWG December2015ProgressReport.htm (announcing federal efforts "to ensure that unscrupulous parties do not attempt to misuse immigration enforcement or labor laws

to thwart or manipulate worker protections or labor and immigration enforcement"). Congress has similarly noted the need to harmonize federal immigration enforcement with the public interest in protecting victims of human trafficking. *See* 22 U.S.C. § 7101(b)(19) (finding that "[v]ictims . . . should not be inappropriately . . . penalized solely for unlawful acts committed as a direct result of being trafficked," including "using false documents").

Enforcement of the challenged provisions against persons who commit fraud to demonstrate work authorization under federal immigration law interferes with federal control over the operation of this scheme. By "impos[ing] [their] own penalties" for conduct already addressed by federal immigration law, *Arizona*, 132 S. Ct. at 2502, the challenged Arizona criminal laws "divest[] federal authorities of the exclusive power to prosecute" the offense. *Valle del Sol*, 732 F.3d at 1027. Such encroachment upon federal enforcement prerogatives risks interference with the federal scheme, particularly where federal officials have consciously determined *not* to criminally prosecute a particular unauthorized alien. The federal determination of how best to enforce sanctions under the immigration laws may in some circumstances implicate foreign affairs, including the need to account for reciprocal criminal enforcement by other countries. *See Arizona*, 132 S. Ct. at 2498. And different state laws regulating fraud committed to demonstrate authorization to work in the United States could give rise to a troubling patchwork of inconsistent penalties. Thus, although the challenged provisions may "attempt[] to achieve one of the same goals as

20

federal law—the deterrence of unlawful employment—[they] involve[] a conflict in the method of enforcement." *Id.* at 2505.[5]

For these reasons, in addition to holding the challenged Arizona laws preempted insofar as they rely for their enforcement on information in or accompanying the Form I-9, the Court should hold those laws preempted to the extent they criminalize fraud committed to demonstrate an alien's authorization to work in the United States under federal immigration law.[6]

### B. The Arizona Laws Are Not Preempted in All Applications, and this Court Should thus Affirm the Injunction Only in Part.

The district court acknowledged that "[t]he challenged laws are facially neutral" in that they criminalize identity theft to obtain or continue employment "regardless of

---

[5] Contrary to defendants' assertion (State Br. 19; State Reply Br. 8-9), Arizona does not enjoy "concurrent jurisdiction" over fraud committed to demonstrate work authorization under federal immigration law. As explained above, the "power to restrict, limit, [and] regulate" aliens is *not* a "concurrent power of state and nation." *Hines*, 312 U.S. at 68; *see also Villas at Parkside Partners v. City of Farmers Branch*, 726 F.3d 524, 528-29 (5th Cir. 2013) (en banc) (rejecting "concurrent enforcement" theory in other immigration contexts); *Lozano v. City of Hazleton*, 724 F.3d 297, 319-20 (3d Cir. 2013) (same); *United States v. Alabama*, 691 F.3d 1269, 1286-87 (11th Cir. 2012) (same).

[6] There is no merit to defendants' suggestion that the United States is judicially estopped from arguing that the Arizona laws are preempted. *See* Oral Arg. at 14:47-15:10. Judicial estoppel "generally prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001). The United States is not a party to this case, and its position in past litigation—in which the question of preemption was not raised—that certain forms of identity theft are crimes of moral turpitude, *see, e.g., Ibarra-Hernandez v. Holder*, 770 F.3d 1280, 1281-82 (9th Cir. 2014), does not bar it from addressing a preemption question raised for the first time here.

the immigration status of the person using the information." ER 25. The court further observed that "[m]any, *though not all*, of the people charged [by state and local officials] under these statutes [were] unauthorized aliens." ER 16 (emphasis added). The court nonetheless concluded that the laws are likely preempted in their entirety because "they are aimed at imposing criminal penalties on unauthorized aliens who seek or engage in unauthorized employment in the State of Arizona." ER 27. Because the record indicates that the challenged provisions have at least some applications that do not implicate the federal immigration prerogatives discussed above, the Court should hold more narrowly that the laws are preempted only to the extent they intrude upon or interfere with federal immigration law.

It is well established that state law must "give way to federal law" to the extent the latter intrudes on a subject of exclusive federal regulation or interferes with the accomplishment of federal objectives. *Arizona*, 132 S. Ct. at 2501. Thus, the question in any case involving preemption is whether *and to what extent* the challenged laws intrude on a field that Congress has pervasively occupied, or stand as an obstacle to the accomplishment of the federal scheme. *See Exxon Corp. v. Hunt*, 475 U.S. 355, 358 (1986) (holding law "pre-empted in part" to the extent of conflict with federal law).

The challenged Arizona provisions generally criminalize "taking the identity of another person or entity . . . with the intent to obtain or continue employment." Ariz. Rev. Stat. § 13-2008(A); *see id.* § 13-2009(A)(3) (similar). The regulation of theft, including identity theft, ordinarily falls within the States' traditional police powers. *See*

22

*Galper v. JP Morgan Chase Bank, N.A.*, 802 F.3d 437, 448 (2d Cir. 2015). Federal law, specifically 18 U.S.C. § 1028, also criminalizes identity theft more generally. But unlike federal laws governing fraud committed to demonstrate work authorization under federal immigration law, § 1028 is not part of a comprehensive scheme of federal regulation in an area of overriding federal concern. And state laws criminalizing types of identity theft unrelated to federal immigration law are no more subject to preemption than are state laws criminalizing other conduct that also is prohibited by federal law, *e.g.*, bank robbery or drug offenses. There is no evidence that Congress intended to preempt state laws criminalizing instances of identity theft that do not implicate federal immigration prerogatives.

On their face, the challenged state laws seem capable of application to matters that fall within traditional areas of state authority. Unlike the laws challenged in *Arizona*, 132 S. Ct. 2492; *South Carolina*, 720 F.3d 518; and *United States v. Alabama*, 691 F.3d 1269 (11th Cir. 2012), which applied exclusively to aliens, the text of Arizona's identity theft laws is not so limited. It appears that at least some Arizona officials have used the challenged provisions to prosecute identity theft unrelated to federal immigration law, such as fraud committed to hide an employee's past criminal conviction. *See supra* pp. 9-10; State Br. 9 & n.2. Such applications do not implicate federal immigration prerogatives and, indeed, may address important issues properly within the reach of the State's police power.

As discussed above, however, the fact that the challenged laws were drafted in neutral terms does not immunize them from preemption analysis. To the extent the laws rely for their enforcement on information in or accompanying the Form I-9 or criminalize fraud committed to demonstrate work authorization under federal immigration law, they are preempted because they trench on exclusively federal immigration prerogatives and stand as an obstacle to the federal scheme. The challenged Arizona laws are thus not preempted in their entirety, but they are categorically preempted in their principal application. *See, e.g.*, *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (addressing comparable challenge that was "facial" in one sense and "as-applied" in another).

That plaintiffs have advanced a facial challenge in seeking a preliminary injunction does not preclude this Court from holding the challenged laws to be categorically preempted in part, and thus affirming the preliminary injunction to that extent. Appellate courts have authority to determine the proper scope of injunctive relief de novo and to modify an injunction as necessary to conform its terms to law. *See, e.g.*, *United States v. National Treasury Emps. Union*, 513 U.S. 454, 477-78 (1995) (modifying "overinclusive" injunction); *Melendres v. Arpaio*, 784 F.3d 1254 (9th Cir. 2015) (affirming majority of injunction against Maricopa County Sheriff's Office while directing certain modifications on remand); *E. & J. Gallo Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1283 (9th Cir. 1992) (affirming injunction after "modify[ing] [its] scope").

The Supreme Court's decision in *Citizens United v. FEC*, 558 U.S. 310 (2010), indicates that the failure to argue specifically for narrower relief does not preclude the award of such relief in appropriate circumstances.[7]  In that case, the Court facially invalidated a federal campaign finance law even though the plaintiffs had pressed only an as-applied challenge.  The Court explained that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge," and it should not "prevent[] the Court from considering certain remedies if those remedies are necessary to resolve a claim that has been preserved."  *Id.* at 331; *see also Reed*, 561 U.S. at 194 ("The label is not what matters.").

## CONCLUSION

For the foregoing reasons, the Court should affirm the preliminary injunction insofar as it precludes the application of the challenged provisions to the extent they rely for their enforcement on information in or accompanying the Form I-9 or regulate fraud committed to demonstrate work authorization under federal immigration law.

---

[7] Although plaintiffs pressed a facial challenge in their motion for preliminary relief, their complaint also includes a request for targeted relief to enjoin defendants from "using information or documents undocumented workers submit to show federal authorization to work as the basis for any arrest or prosecution."  ER 3320.

Respectfully submitted,

BENJAMIN C. MIZER
   *Principal Deputy Assistant*
    *Attorney General*

JOHN S. LEONARDO
   *United States Attorney*

BETH S. BRINKMANN
   *Deputy Assistant Attorney General*

MARK B. STERN
s/ Lindsey Powell
LINDSEY POWELL
JEFFREY E. SANDBERG
WILLIAM E. HAVEMANN
   *(202) 616-5372*
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7214*
   *U.S. Department of Justice*
   *950 Pennsylvania Ave., NW*
   *Washington, DC 20530*

MARCH 2016

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Brief for the United States as Amicus Curiae is twenty-five pages, consistent with this Court's January 29, 2016, order.

s/ Lindsey Powell
LINDSEY POWELL

## CERTIFICATE OF SERVICE

I hereby certify that on March 25, 2016, I filed the foregoing brief by causing a digital version to be filed electronically via the CM/ECF system.  Counsel will be served by the CM/ECF system.


s/ Lindsey Powell
LINDSEY POWELL